**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 20-** |
| **v.** | : | **DATE FILED:** |
| **RAYAN VANDERHOOF** | : | **VIOLATIONS:** |
| | | **18 U.S.C. § 371 (conspiracy to pay and** |
| | : | **receive kickbacks – 1 count)** |
| | | **18 U.S.C.  § 2 (aiding and abetting)** |
| | : | **Notice of forfeiture** |

**I N F O R M A T I O N**

**COUNT ONE**

**(Conspiracy to Pay and Receive Kickbacks)**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this Information:

**The Medicare Program**

1.      Medicare was a federally-funded health care program that provided benefits to

persons who were at least 65 years old or disabled.  Medicare was administered by the Centers

for Medicare and Medicaid Services ("CMS"), a federal agency under the United States

Department of Health and Human Services ("HHS").  Individuals who received benefits under

Medicare were referred to as Medicare "beneficiaries."  Medicare was divided into multiple

parts:  Part A covered hospital inpatient care; Part B covered physicians' services and outpatient

care, including an individual's access to durable medical equipment ("DME"), such as orthotic

braces; Part C was Medicare Advantage Plans; and Part D covered prescription drugs.

2.      Physicians, clinics, and other health care providers, including DME companies

and laboratories, all of which provided services to Medicare beneficiaries, were able to apply for

and obtain a Medicare "provider number."  A health care provider that received a Medicare

1

provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

3.      A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").  The claim form could be submitted in hard copy or electronically.

4.      Enrolled Medicare providers agreed to abide by Medicare's policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers were required to abide by all Medicare-related laws and regulations, including the Anti-Kickback Statute, which proscribed the offering, payment, solicitation, or receipt of any remuneration to induce the referral of a patient or the purchase, lease, order, or arrangement therefor, of any good, facility, service, or item for which payment may be made by a federal health care program.  Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

5.      Medicare only paid for services that were medically necessary and reasonable, and which were actually provided as represented.  Medicare did not pay claims for beneficiaries, items, or services that were procured based on the payment or receipt of kickbacks and bribes.

6.      Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

**Durable Medical Equipment**

7.      Medicare Part B covered certain DME, such as Off-The-Shelf ("OTS") knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").  OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual.

8.      A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary to the treatment of the beneficiary's illness or injury and prescribed by the beneficiary's physician.

**Cancer Genomic Testing**

9.      Medicare Part B also covered medical testing by clinical laboratories, including cancer genomic ("CGx") testing.  CGx testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.

10.     Generally, in order to have a CGx test conducted, an individual completed a buccal or nasopharyngeal swab, or a respiratory sample, to collect a specimen, which specimen was then transmitted to a laboratory for testing.

11.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  Title 42, United States Code, Section 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than

3

treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of

Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered

were cancer screening tests such as "screening mammography, colorectal cancer screening tests,

screening pelvic exams, [and] prostate cancer screening tests." *Id.*

12.     If diagnostic testing was necessary for the diagnosis or treatment of illness or

injury, or to improve the functioning of a malformed body member, Medicare imposed

additional requirements before covering the testing. Title 42, Code of Federal Regulations,

Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other

diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the

physician who furnishes a consultation or treats a beneficiary for a specific medical problem and

who uses the results in the management of the beneficiary's specific medical problem." "Tests

not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

*Id.*

13.     Because CGx testing did not diagnose cancer, Medicare only covered the costs of

such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's

treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.

Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked

symptoms of cancer.

**The Defendant and Related Individuals and Entities**

14.     Defendant RAYAN VANDERHOOF  was the owner and operator of Olympus Medical Group Corporation ("Olympus Medical Group"), a corporation formed in Henderson, Nevada, and operating in Costa Mesa, California.  Olympus Medical Group was a telemarketing company.

15.     Company 1, a limited liability company duly organized and existing under the laws of the State of Florida, was a lead vendor.  A lead vendor was a company that created advertising campaigns to generate interest by Medicare beneficiaries in particular items and services. "Leads" refers to contact information for Medicare beneficiaries who demonstrated interest. A lead vendor sold the leads to the companies who provided the particular items and services.

16.     Individual 1, who is known to the United States Attorney, was an owner and operator of Company 1.

17.     Company 2, a limited liability company duly organized and existing under the laws of the State of Delaware, was a telemedicine company.

18.     Individual 2, who is known to the United States Attorney,  was the owner and operator of Company 2.

**The Kickback Conspiracy**

19.     From at least in or about January 2017 to in or about November 2019, the defendant, RAYAN VANDERHOOF, together with Individual 1, Individual 2, and other co-conspirators, devised and participated in a scheme to offer, pay, solicit, and receive kickbacks and bribes in exchange for doctors' orders that were used to support claims for DME and CGx tests that were submitted to Medicare for reimbursement.

5

20.     Defendant RAYAN VANDERHOOF, together with other co-conspirators, paid illegal per-lead kickbacks and bribes to Individual 1 in exchange for raw leads, which consisted of a prospect's name, contact information, and interest in speaking with a DME supplier.

21.     Defendant RAYAN VANDERHOOF, together with other co-conspirators, obtained doctors' orders for DME and CGx tests by paying kickbacks and bribes to telemedicine company owners and operators, including Individual 2.  Defendant VANDERHOOF knew that co-conspirator doctors signed the orders, thereby prescribing the DME and CGx tests, without regard to their medical necessity.  Co-conspirators then used these doctors' orders to submit claims for reimbursement to Medicare for DME and CGx tests that were not eligible for reimbursement because they were procured through the payment of kickbacks and bribes.

22.      Defendant RAYAN VANDERHOOF, together with other co-conspirators, received kickback payments from owners and operators of DME companies and laboratories, in exchange for providing and acquiring completed doctors' orders for DME and CGx tests.

23.     Defendant RAYAN VANDERHOOF, together with other co-conspirators, offered and paid approximately $800,000 in kickbacks and bribes to Individual 1 and others in exchange for raw leads for DME and CGx tests.

24.     Defendant RAYAN VANDERHOOF, together with other co-conspirators, offered and paid approximately $650,000 in kickbacks and bribes to Individual 2 and others in exchange signed doctors' orders prescribing DME and CGx tests.

25.     Defendant RAYAN VANDERHOOF, together with other co-conspirators, submitted and caused the submission of more than approximately $20.2 million in false and fraudulent claims to Medicare, on behalf of DME companies for DME that were procured through the payment of illegal kickbacks and bribes, were ineligible for Medicare

reimbursement, or were not provided as represented, for which Medicare paid approximately $6.9 million for those claims.

26.     From at least in or about January 2017 to in or about November 2019, in the Eastern District of Pennsylvania, and elsewhere, defendant

**RAYAN VANDERHOOF**

knowingly and willfully conspired and agreed with others known and unknown to the United States Attorney, including Individual 1 and Individual 2 known to the United States Attorney, to commit certain offenses against the United States, that is: (1) to solicit and receive remuneration, specifically, kickbacks, directly and indirectly, overtly and covertly, in return for referring individuals, specifically, Medicare beneficiaries to Company 2 and others, for the furnishing of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1); and (2) to offer and pay remuneration, specifically, kickbacks, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2).

OVERT ACTS

27.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of Pennsylvania and elsewhere, the defendant, RAYAN VANDERHOOF, together with

other co-conspirators, committed and caused to be committed, among others, the following overt acts:

       a.     On or about March 26, 2018, defendant RAYAN VANDERHOOF caused a wire transfer to Company 2 in the approximate amount of $15,000 from a JPMorgan Chase account number ending in 7305, held in the name of Olympus Medical Group.

       b.     On or about April 18, 2018, defendant RAYAN VANDERHOOF caused a wire transfer to Company 2 in the approximate amount of $15,000 from a JPMorgan Chase account number ending in 7305, held in the name of Olympus Medical Group.

       c.     On or about October 25, 2018, defendant RAYAN VANDERHOOF caused a wire transfer to Company 2 in the approximate amount of $15,000 from a JPMorgan Chase account number ending in 7305, held in the name of Olympus Medical Group.

       All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.    As a result of the violation of Title 18, United States Code, Section 371, set forth in this Information, defendant

**RAYAN VANDERHOOF**

shall forfeit to the United States of America any property, real or personal, that constitutes, or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense, including, but not limited to, the sum of $1,647,400.

2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the Court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(7).

_____
WILLIAM M. McSWAIN
United States Attorney
Eastern District of Pennsylvania


ROBERT ZINK
Chief, Fraud Section
Criminal Division

*No. 2020R00582*

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

vs.

RAYAN VANDERHOOF

**INFORMATION**

18 U.S.C. § 371 (conspiracy to pay and receive kickbacks – 1 count)

Notice of Forfeiture

A true bill.

_____
Foreman

Filed in open court this _____ day,

Of _____ A.D. 20 _____

_____
Clerk

Bail, $ _____